UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ASHETON S. MORGAN #746570,                    Case No. 2:19-cv-00003

                    Plaintiff,                Hon.  Jane M. Beckering
                                              U.S. District Judge
        v.

TONY TRIERWEILER, et al.,

                    Defendants.

_____/

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation (R&R) addresses a motion for summary judgment filed by the three remaining Defendants in the case – Warden Trierweiler, Deputy Warden Davids and Prison Counselor (PC) Buchin, each of whom was an employee of the Michigan Department of Corrections (MDOC) at the Bellamy Creek Correctional Facility (IBC) at the time of the events in this case.  (ECF No. 93.)

Plaintiff – former State prisoner Asheton S. Morgan – initially filed this civil rights action against multiple Defendants. (ECF No. 1.)  At this point, only Morgan's claim under the free exercise clause of the First Amendment remains.[1]  Morgan is a

_____

[1]     On May 14, 2019, U.S. District Judge Paul L. Maloney issued an opinion and order dismissing all Defendants and claims except for Morgan's First Amendment and Religious Land Use and Institutionalized Person Act (RLUIPA) claims against Trierweiler, Davids and Buchin.  (ECF Nos. 10, 11.) According to the MDOC's OTIS website, Morgan was released from prison on June 30, 2020.  Thus, he may not pursue injunctive relief.  In addition, as the undersigned noted in an order dated Aug. 19, 2021, Morgan may not obtain money damages under RLUIPA.  (ECF No. 83,

practicing Muslim.  He claims that Defendants unlawfully denied him Halal meals while he was imprisoned at IBC.

Defendants assert that they are entitled to summary judgment because the evidence before the Court shows (1) that Plaintiff failed to exhaust his administrative remedies, (2) that Defendants lacked personal involvement in the alleged constitutional violations of Plaintiff's religious rights, and (3) that Plaintiff had access to meals that met the requirements of his faith.  (*Id.*)

Morgan and hundreds of other prisoners were involved in a prison riot at the Kinross Correctional Facility (KCF) on September 10, 2016.  The hundreds of prisoners involved in the riot, including Morgan, were transferred to different facilities throughout the MDOC.  Morgan was transferred to IBC on September 13, 2016.  The day before his transfer, September 12, Morgan was charged with a Class I Misconduct for "incite to riot; rioting or striking" at KCF.  Upon arrival at IBC, he was housed in temporary segregation pending adjudication of the Class I misconduct ticket.  Ten days after his arrival at IBC, on September 23, Morgan was found guilty of this Class I misconduct.  He was then transferred to administrative segregation. At that point, the IBC Security Classification Committee (SCC), which allegedly included Buchin and Davids, took responsibility for making recommendations about transferring Morgan.  On October 25, 2016, the SCC recommended transferring Morgan to another prison; Warden Trierweiler approved the recommendation the

---

PageID.567-68.)  As a result, only Morgan's First Amendment free exercise claims against Trierweiler, Davids and Buchin remain.

next day.  Morgan was transferred out of IBC on November 17, 2016.  (ECF No. 94-12, PageID.966 (transfer order).)

Morgan says he immediately complained about the unavailability of satisfactory meals and filed a grievance.  The records before the Court support this claim.  Morgan filed a grievance on September 18, 2016.  In that grievance he complained that staff at IBC unlawfully denied him access to meals that met the requirements of his religion and refused to transfer him.

Morgan's claim with respect to the events on the day he transferred to IBC – September 13, 2016 – are relatively simple to resolve.  Morgan's grievance was processed through Step III of the grievance process.  Thus, Morgan did exhaust his administrative remedies with respect to claims based on events on that day.  But his complaint fails to allege that the three Defendants were personally involved in any unconstitutional act or acts on that day.  He simply says that they were informed of the alleged deprivations.  Thus, Defendants are entitled to summary judgment as to the events on September 13, 2016 due to their lack of personal involvement.

A review of the pleadings shows that the course of events after September 13 becomes more complicated.  As noted, Morgan was initially held in temporary segregation and then moved to administrative segregation after he was found guilty of the Class I misconduct ticket.  The SCC and Warden Trierweiler then became involved in determining if and when to transfer Morgan.  Despite the complexity of the course of events, the record is clear on one point:  Morgan did not file any other grievances with respect to the conditions of his imprisonment at IBC after September

13.  Thus, prison officials were not given an opportunity to address Morgan's claims that actions by the SCC and the Warden *after September 13, 2016* violated his rights under the First Amendment.  Accordingly, the undersigned concludes that the record demonstrates that no genuine issue of material fact remains regarding whether Morgan exhausted his administrative remedies with respect to events after September 13, 2016; the record indicates that he did not.

In summary, the undersigned concludes that no genuine issue of material fact remains regarding (1) whether Defendants were personally involved in any unconstitutional act on September 13, 2016, and (2) whether Morgan exhausted his claims relating to events after September 13, 2016.  On both points, the record shows that Defendants are entitled to summary judgment.  Accordingly, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment and dismiss this case.

## II.  Summary of Plaintiff's Allegations

Morgan's allegations are stated succinctly on page 9 of his complaint.  That page is copied below.

*What are the facts underlying your claim(s)? (For example: What happened to you?*
*Who did what? Was anyone else involved? Who else saw what happened?)*

On 9/13/2016, I arrived at Bellamy Creek Facility (IBC). At which time, I immediately informed Nurse Alberts, c/o Dewey, Lt. Gilbert Cpt. Wise, PC Normington, Lt. Moye, Sgt. Bunting, c/o Drake, c/o Shattuck, Deputy Warden McCully, Deputy Warden John Davids, PC Jared Buchin, Resident Unit Manager R. Mote, and Tony Trierweiler about being forced to eat food in violation of my Islamic Beliefs, through means of depravation. The unavailability of an Islamic/Halal diet at IBC (1) On 9/30/2016 C. Hull explained that due to my behavior and classification to Segregation, I will not be fed a halal meal. Instead I will be fed in accordance of P.D. 04.05.120 (inmates in segregation dietary guidelines) On the same day B. Youngs reviewed and approved C. Hull's response. (2) Both Youngs and Hull ack- Nowledged IBC could not accomodate my religious needs. (3) On 10/4, 10/11, 10/18/2016 during Security Classification Committee interview; R. Mote, J. Davids, and Jared Buchin also acknowledged IBC wouldn't accomodate a religious meal. Again, due to my behavior I will not be awarded this right nor will I be transferred to a facility that can accomodate my security and dietary needs. I was reminded consistantly that because of me being accused of participating in a prison riot was the reason for my punishment. On 10/25/2016 Tony Trierweiler consented to C. Hull and B. Youngs response, deeming said response accurate and appropriate. (4) Also on this date defendants R. Mote, Davids, and Buchin Expressed that I was going to be sent to Ionia Max across the street. But my transfer was delayed in order to send me back to Kincheloe, MI where the riot occured and to Alger Max (5) Even after explaining my deep fear of harm and retaliation, defendants laughed and said "we should send you there" (6) From 9/13/2016 until 11/20/2016, T. Trierweiler approved transfers for religious diets, but delayed mine out of malice and retaliation to my behavior. Then purposely delayed my transfer to send me to a facility where I endured inhumane treatment, violation of my religious rights, violations of my due process, and denial of legal material. On several occasions I explained to those mentioned that these actions were illegal.

(ECF No. 1, PageID.9.)

To summarize, Morgan alleges that on September 13, 2016, he arrived at IBC

where he informed Davids, Buchin, and Trierweiler, as well as several other prison

5

officials, that because of the unavailability of a Halal diet at IBC, he was being forced to eat foods that violated his Islamic beliefs. (ECF No. 1, PageID.9.)

Morgan says he was told by an MDOC employee on September 30, 2016, that he would not be receiving a Halal meal because he was classified in segregation.  (*Id.*) Morgan says that on October 4, 11, and 18, 2016, the SCC, which included Davids and Buchin, told him that due to his behavior and classification, he would not be transferred to a facility which could accommodate his religious dietary needs.  (*Id.*)

Morgan says that, on October 25, 2016, Warden Trierweiler agreed with the SCC decision to not transfer Morgan.  (*Id.*)  In addition, Morgan says that between September 13, 2016, and November 20, 2016, Trierweiler approved transfers for religious diets for other prisoners, but purposely delayed Morgan's request to transfer in violation of his rights and to transfer him to a facility where he "endured inhumane treatment."[2]  (*Id.*)

### III.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether

---

[2]     Defendants argue that IBC offered all prisoners a vegetarian option and Morgan had the option to select non-meat items from the vegetarian option that complied with his religious beliefs.  (ECF No. 113, PageID.1384.)  The policy states that menus are posted one week in advance, prisoners may abstain from eating foods that violate their religious belief, and that non-meat entrees are available.  Policy Directive 05.03.150 NN.  (ECF No. 94-15, PageID.985.)

summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury[3] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.  Exhaustion of Administrative Remedies

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove.  *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).  "[W]here the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).

---

[3]      If defendants move for summary judgment on the basis of exhaustion under the PLRA, and the court determines that there is a genuine issue of material fact, the issue need not be submitted to a jury.  *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).  Instead, the court may conduct a bench trial to resolve the issue.  (*Id.*)  In a bench trial on exhaustion, the defendants must show that the plaintiff failed to exhaust his administrative remedies by a preponderance of the evidence.  *Id.* at 677 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)) ("Failure to exhaust administrative remedies is an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence."); *Richards v. Perttu*, No. 2:20-CV-76, 2022 WL 842654, at *1 (W.D. Mich. Mar. 22, 2022) (affirming a magistrate judge's ruling that the preponderance of the evidence standard applies in a bench trial on exhaustion).

The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).  A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process.  *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999).  In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"  *Jones*, 549 U.S. at 218-19.  In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion

procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524.  In the Court's view, this objective was achieved in three ways.  First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525.  Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737*).*  And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id.*  When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

The most common procedure through which a prisoner in MDOC custody exhausts his administrative remedies is the grievance procedure set forth in Michigan Department of Corrections (MDOC) Policy Directive 03.02.130 (effective on July 9, 2007, superseded on March 18, 2019).  According to the Policy Directive inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his

or her control.  *Id.* at ¶ P.  If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution.  *Id.* at ¶¶ P, V.  The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ V.  The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included."  *Id.* at ¶ R (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.  *Id.* at ¶¶ T, BB.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances.  *Id.* at ¶ DD.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form.  *Id.* at ¶¶ T, FF.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.* at ¶¶ T, FF.  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ GG.

"The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved." *Id.* at ¶ S.

In addition, the grievance policy provides that, where the grievance alleges conduct that falls under the jurisdiction of the Internal Affairs Division pursuant to Policy Directive 01.01.140, the prisoner may file his Step I grievance directly with the inspector of the institution in which the prisoner is housed, instead of with the grievance coordinator, as set forth in ¶ W of Policy Directive 03.02.130. *Id.* at ¶ R. In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I. *Id.* Regardless of whether the grievance is filed with the grievance coordinator or the inspector, the grievance will be referred to the Internal Affairs Division for review and will be investigated in accordance with MDOC Policy Directive 01.01.140. The prisoner will be promptly notified that if extension of time is needed to investigate the grievance. *Id.*

Where the grievance procedures are not available because the issue presented is non-grievable, exhaustion of prison grievance procedures is not required. It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-

grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well known proverb states, they cannot have their cake and eat it too.").

When prison officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those rules will not bar that prisoner's subsequent federal lawsuit. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).  The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief. *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process.").  An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits. *See id.* at 325.   We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court." *Id.* at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[4]

**V.  Analysis**

---

[4]    In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints."  *Id.* at 596. For example, grieving a doctor about his failure to give cardiac catheterization did not grieve the claim that the doctor erred by not prescribing Ranexa.

12

### 1. Morgan's Claims Regarding events on September 13, 2016

The record before the Court contains one grievance that Morgan filed at IBC. (*See* ECF No. 94-5, PageID.896 (MDOC Prisoner Step III Grievance Report).)   That grievance is **IBC-16-09-2280-20E**.  (ECF No. 94-5, PageID.900.)  Defendants Warden Trierweiler, Deputy Warden Davids, and Prison Counselor Buchin were not named in this grievance.   Defendants argue that Morgan's failure to name them in an exhausted grievance requires dismissal of this case.  Morgan argues that by including the word "staff" in his grievance he exhausted his claims against Defendants.  The MDOC did not reject the grievance at any step.

Morgan's Step I grievance is shown below.



(ECF No. 94-5, PageID.900.)

Morgan's Step I grievance was denied on September 30, 2016. (*Id.*,
PageID.901.)  The Step I grievance response explained:

> Chaplain Thompson was contacted regarding Mr. Morgan's grievance.
> Chaplain Thompson confirms that prisoner Morgan is approved for a
> religious diet. PD 05.03.150 states that all recognized religions enjoy
> equal status and protection but are subject to those limitations
> necessary to maintain the safety, good order and security of the facility,
> including the health and safety of prisoners and staff. After being
> interviewed on this grievance, prisoner Morgan was classified to
> Administrative Segregation as the result of participating in a
> disturbance at KCF. PD 04.05.120, V, #8 states a prisoner in segregation
> shall be provided with three meals per day served from the same menus
> available to general population prisoners. This includes, as required,
> meals from the therapeutic diet menu and, if available at that facility,
> meals from a menu developed to meet the necessary religious dietary
> restrictions of the prisoner.  The religious diet menu is not available at
> IBC because the facility is not a designated location for the Vegan menu
> designed to meet the religious dietary needs of prisoners. In accordance
> with PD 04.05.120, prisoner Morgan will be served meals from the same
> menus available to general population prisoners while housed in
> Administrative Segregation at IBC. SCC [Security Classification
> Committee] will determine prisoner Morgan's release and/or
> appropriate transfer from IBC's Administrative Segregation Unit with
> consideration for safety and security concerns.

(*Id.*, PageID.901.)

On October 17, 2016, Morgan appealed at Step II by asserting "I am still being
denied my rights to practice my religion." (*Id.*, PageID.898.) This Step II grievance
appeal was denied by Warden Trierweiler on October 25, 2016. (ECF No. 94-5,
PageID.899.)  Warden Trierweiler reasoned that the Step I response was adequate
and appropriate, and that no evidence was presented by Morgan to substantiate his
allegations. (*Id.*)

Morgan then filed a Step III grievance appeal. (*Id.*, PageID.898.) This appeal was denied and mailed on August 18, 2017, because "[Morgan's] issue was in fact considered, investigated and a proper decision was rendered." (*Id.*, PageID.897.)

The MDOC requires a prisoner to identify the individuals being grieved, *Reed-Bey*, 603 F.3d at 324-25, and the subject matter of the grievance. *Mattox*, 851 F.3d at 596. An inmate must name each defendant in a properly exhausted grievance before he files a federal complaint. *Kean v. Hughes*, No. 1:12-cv-847, 2013 WL 5771146 at *2 (W.D. Mich. Oct. 24, 2013) ("The MDOC had no reason to address a claim against any other employee"). Where a prisoner fails to name a Defendant in his Step I grievance, or mentions an individual is involved for the first time during the Step III appeal of the denial of a grievance, the claim against that individual is not properly exhausted. *Id.* at *6.

Where the prisoner fails to name any individual in his grievance and the MDOC considers the merits of the grievance by not rejecting the grievance, the prisoner's claim is considered exhausted against the named Defendants in the lawsuit. The rationale for this rule is that Court will not enforce the MDOC grievance procedures where the MDOC failed to enforce its rules or waived the enforcement of the rules. *Reed-Bey*, 603 F.3d at 325 ("When prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we.")

Although Plaintiff named several individuals and categories of individuals in his grievance, he did so only to state what actions he took to resolve his grievance.

That section of the grievance form is simply to explain the actions Morgan took under policy to attempt to resolve the issues before he submitted his grievance. That section does not identify or name the officials being grieved.

Morgan did not name any specific individuals in the portion of the grievance that required him to explain his claim. Morgan wrote under the "state the problem" section that his grievance is against "IBC staff". The MDOC did not reject the grievance for failure to name specific individuals. Therefore, broadly interpreting the Step I grievance, Morgan could sue any IBC official on the claims he exhausted in this grievance. That does not mean that Morgan can sue for every alleged violation included in his complaint. Morgan's exhausted claims can only be based upon what he asserted in the grievance.

It is important to note that Morgan's grievance is limited to the stated incident date of September 13, 2016. Morgan's grievance asserts on that date he informed IBC staff that he was being forced to violate his religious beliefs by not eating Halal and not being transferred out of IBC.

Morgan does not show that Defendants were personally involved in any alleged unconstitutional deprivations on that day. In Morgan's complaint, he only asserts that the Defendants were informed that he was being deprived of his right to meals meeting the requirements of his religion. That claim is insufficient. A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the

allegedly unconstitutional conduct.  *Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990).

In addition, nothing in the record before the Court shows that Warden Trierweiler, Deputy Warden Davids, and Prison Counselor Buchin were involved in Morgan's transfer to IBC on September 13, 2016.  Trierweiler testified that hundreds of prisoners were transferred out of KCF after the housing units there were damaged and burned.  (ECF No. 94-4, PageID.889.)  Morgan was one of those prisoners.  (*Id.*)  Trierweiler called Morgan's move an "emergency transfer" that was the result of Morgan's involved in the disturbance at KCF.  (*Id.*)  Indeed, a reasonable interpretation of the record before the Court is that Morgan himself was responsible for his own transfer out of KCF.

With respect to events on September 13, Morgan's complaint alleges, first, that Defendants were informed of a violation of his First Amendment rights.  (ECF No. 1, PageID.9.)  He does not allege that they were personally involved in depriving him of religious meals on September 13.  Second, Morgan fails to offer any proof that Defendants were involved in the decision to transfer him to IBC on that date, or that they could have done anything to alter the transfer decision, i.e. immediately transfer him out.[5]  In short, Morgan has failed to present evidence establishing a genuine

---

[5]    Morgan's complaint alleges that Trierweiler failed to transfer him out of IBC from September 13 to November 20, 2016.  As noted, the record here indicates that Morgan was transferred to IBC on September 13, following a riot at KCF.  Trierweiler testified that he received word from the MDOC's central office that IBC would be receiving a number of prisoners as a result of their involvement in a prison riot.  (ECF No. 94-4, PageID.890.)  The record before the Court contains nothing that indicates that Trierweiler could have transferred Morgan out of IBC on the day he arrived.

issue of material fact regarding whether Defendants were personally involved in any alleged unconstitutional conduct on September 13, 2016.

### 2. Morgan's Claims Regarding Events After September 13, 2016

On September 12, 2016 – the day before Morgan's transfer to IBC – he was charged with a Class I Misconduct for "incite to riot; rioting or striking" at KCF. (ECF No. 94-7, PageID.910.)   Upon arrival at IBC, Morgan was housed in temporary segregation pending adjudication of the Class I misconduct ticket.  (ECF No. 94-6, PageID.905 (Buchin deposition testimony).)   Ten days after his arrival at IBC, on September 23, Morgan was found guilty of this Class I misconduct.  (ECF No. 94-7, PageID.908-9 (Class I Misconduct Hearing Report).)   He was then transferred to the administrative segregation unit.  (ECF No. 94-10, PageID.939 (segregation behavior review).)  Thereafter, the SCC would review his status.  (ECF No. 94-6, PageID.905 (Buchin's deposition).)    Morgan has provided no testimony to contradict this information.

The records before the Court also show that the SCC recommended Morgan's transfer about a month later, on October 25, 2016, and that Warden Trierweiler approved that recommendation.   A portion of the MDOC Segregation Behavior Review on that date is shown below.

---

Furthermore, Buchin's testimony indicated that the SCC would only be able to review Morgan's status after the Class I misconduct ticket was resolved, which occurred on September 23, 2016.  (ECF No. 94-6, PageID.905 (Buchin's deposition); ECF No. 94-7, PageID.910 (Misconduct hearing report).)  The only reasonable conclusion is that MDOC personnel at IBC lacked the authority to transfer Morgan before his misconduct ticket was resolved.

(ECF No. 94-10, PageID.939.)

Morgan was transferred out of IBC on November 17, 2016.  (ECF No. 94-12, PageID.966 (transfer order).)

The parties disagree on the issue of Defendants' personal involvement in events after September 13, 2016.  Morgan's supplemental brief states that Defendants "were aware as early as September 20, and surely September 30, 2016, that Plaintiff had been approv[ed] for religious meals and needed to be transferred from segregation" at IBC.  (ECF No. 120, PageID.1410.)  Viewing the record in the light most favorable to Morgan, Defendants had some personal involvement in the MDOC process that determined if and when to transfer Morgan to a different prison. Defendants have acknowledged their involvement in the Security Classification Committee and in making recommendations that Morgan be transferred to a facility that could provide a religious meal.  (ECF No. 94-10, PageID.939 (MDOC Segregation Behavior Review).)

Regardless, the record is clear on one point:  Morgan did not file any other grievances with respect to the conditions of his imprisonment at IBC after September 13.  Here it is important to distinguish between the claim Morgan raises in his grievance and Morgan's additional claims against Defendants in his complaint.  In his grievance, Morgan asserts that, on September 13, 2016 (the day he was transferred to IBC), he was forced by IBC staff to eat meals in violation of the tenets of his religion and denied an immediate transfer.  (ECF No. 94-5, PageID.900.)  As noted above, Defendants did not have personal involvement in any alleged unconstitutional acts that day.  Morgan was transferred to IBC as a result of his involvement in a riot.  He was one of hundreds of prisoners who were transferred.  In Morgan's civil complaint, he adds new claims:  that Defendants – through their work on the SCC (Davids and Buchin) or reviewing SCC recommendations (Trierweiler) – subsequently delayed his transfer to a different prison that could accommodate his religious dietary needs. (ECF No. 1, PageID.9.)  Morgan specifically identifies SCC decisions or recommendations on October 4, 10, and 18, 2016, and a decision by Trierweiler on October 25, 2016, and Trierweiler's decision to not transfer Morgan from September 13 to November 20, 2016.[6]  (ECF No. 1, PageID.9.)  Those claims are unexhausted.  They certainly could not have been exhausted by the filing of grievance **IBC 16-09-2280-20E,** which dealt with events on September 13, 2016.

---

[6]    As explained in footnote 5, it is reasonable to conclude that MDOC personnel at IBC lacked the authority to transfer Morgan out prior to the resolution of his Class I misconduct ticket.

A review of the remainder of the record demonstrates that Morgan did not file a grievance naming Defendants for failing to transfer him to a new prison that could accommodate his religious dietary needs.  Morgan knew that Defendants acted and made decisions with respect to his status *after September 13, 2016*.  But Morgan did not submit a grievance involving his allegations that Defendants violated his rights while conducting or approving SCC reviews.

Morgan's allegations against Defendants Warden Trierweiler, Deputy Warden Davids, and Prison Counselor Buchin, for events after September 13, 2016 were never exhausted in a grievance.

In summary, the record before the Court fails to establish a genuine issue of material fact regarding whether the Defendants were personally involved in depriving Morgan of his religious rights on September 13, 2016.  And the record before the Court demonstrates that Morgan did not exhaust any First Amendment claims that were based on actions after September 13, 2016.  Morgan never filed a grievance asserting that Warden Trierweiler, Deputy Warden Davids, and Prison Counselor Buchin purposely delayed his transfer to a facility that could provide him a religious meal.

## VI. Vegetarian Meal Accommodation

Defendants argue that they could not have violated Morgan's First Amendment rights because IBC offered a vegetarian meal option for all prisoners and Morgan could choose that option to comply with his religious beliefs.  The MDOC Policy Directive provides that  "non-meat entrees" shall be available to all prisoners:

REGULAR DIET MENU

H.    The Administrator of the Operations Division, CFA, shall ensure that standardized regular diet menus are issued to be used at all CFA correctional facilities and at the Tuscola RRTP facility.  The menu shall identify the food items to be served at each meal and the minimum portions of each item.  The menu shall include standardized healthy choice dietary options and, for the noon and evening meals, non-meat entrees.

MDOC Policy Directive 04.07.100 (ECF No. 94-14, PageID.977.)

This Court has determined that the First Amendment is not violated if a Muslim inmate has the option to choose foods that will not violate religious tenants. *Hudson v. Caruso*, 748 F. Supp. 2d, 721, 729 (W.D. Mich. 2010) ("These dietary restrictions do not require the MDOC to provide that prisoner with Halal meat entrees.  On the contrary, courts have determined that a correctional facility need only provide Muslim prisoners with food that is not haram.")  A Muslim inmate can comply with the prohibition of eating non-Halal meat by eating vegetarian meals. *Abdullah v. Fard*, 173 F.3d 854, at *1 (6th Cir. 1999).  "[V]egetarian meals are, in fact Halal." *Robinson v. Jackson*, 615 Fed. Appx. 310, 313 (6th Cir. 2015).  As the Sixth Circuit has explained, while prisoners have a Constitutional right under the First Amendment to exercise their religious beliefs and to receive meals that do not violate those beliefs, there "no constitutional right for each prisoner to be served the specific foods he desires – such as Halal meat – in prison. *Id.* at 314.

Morgan argues that he was not served a vegetarian option and only received meals at IBC that violated his religious beliefs.  Defendants argue that if Morgan did not select the vegetarian option, it is because he made that choice.  Morgan explains that the meals that he received violated his beliefs because he was served meat and vegetables and the non-Halal meat touched the vegetables causing contamination.

(ECF No. 109-2, PageID.1257 (Morgan's deposition transcript).)  In the opinion of the undersigned, Morgan has presented enough evidence to raise a genuine issue of fact as to whether the prison failed to offer him a vegetarian meal that could comply with his religious beliefs.

### VII.  Conclusion and Recommendation

The undersigned concludes that no genuine issue of material fact remains regarding (1) whether Defendants were personally involved in any unconstitutional act on September 13, 2016, and (2) whether Morgan exhausted his claims relating to events after September 13, 2016.  On both points, the record shows that Defendants are entitled to summary judgment.  Accordingly, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment and dismiss this case.

If the Court accepts this recommendation the case will be dismissed.

Dated:  April 15, 2022                    /s/ *Maarten Vermaat*
                                          MAARTEN VERMAAT
                                          U. S. MAGISTRATE JUDGE

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).